**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| PAUL ROGERS, MARK LEVELL, and COLLEEN TALLEY, on behalf of themselves and all other similarly situated plaintiffs known and unknown, | ) ) ) ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) | No. 11 C 5550 |
| AT&T SERVICES, INC. and LORI BOZADA, | ) ) ) | |
| Defendants. | ) | |

**MEMORANDUM OPINION**

Before the court are the parties' cross-motions for summary judgment and the defendants' motion for sanctions. For the reasons explained below, the court: (1) grants the defendants' summary-judgment motion in part, and denies it in part; (2) denies the plaintiffs' summary-judgment motion; and (3) denies the defendants' motion for sanctions.

**BACKGROUND**

Plaintiffs Paul Rogers, Mark Levell, Mary Colleen Talley, and Corey DalCerro worked for defendant AT&T Services, Inc. ("AT&T") as "Problem Determination Managers" ("PDMs"). They allege that AT&T and Lori Bozada, their supervisor, violated federal and state wage

- 2 -

laws by failing to pay them overtime.[1]  The parties dispute: (1) whether the plaintiffs are exempt from the Fair Labor Standards Act's ("FLSA") overtime requirements, see 29 U.S.C. § 213(a); (2) whether the defendants willfully violated the FLSA, see id. at § 255(a); and (3) whether Bozada was their "employer" as the FLSA defines that term, see id. at § 207(a)(1).[2]

## I.   AT&T "Outage Calls"

AT&T utilizes a large network of computer systems to carry out its business (e.g., mobile-phone sales, billing, etc.).  (Defs.' L.R. 56.1 Stmt. of Facts ("Defs.' Stmt.") ¶ 4.)  The software that performs these functions typically consists of: (1) "front-end" applications (e.g., the electronic form that the customer completes to order a phone); (2) "back-end" applications (e.g., software that checks inventory to determine what phones are available); and (3) "middleware" applications.  (Id. at ¶ 5.)  The middleware applications direct the flow of information between the front-end

---

[1]  Rogers, Levell, and Talley filed this action on their own behalf and on behalf of similarly situated employees.  The court authorized the plaintiffs to notify potential collective-action members — current and former PDMs who reported to Bozada — in February 2012.  (See Minute Entry, dated Feb. 8, 2012, Dkt. 30.)  Only DalCerro joined the lawsuit.

[2]  The plaintiffs have also filed claims against the defendants for allegedly violating the Illinois Minimum Wage Law ("IMWL") and the Illinois Wage Payment and Collection Act ("IWPCA").  (See Second Am. Compl. ¶¶ 18-27.) The parties effectively agree that the plaintiffs' state-law claims hinge on the defendants' liability under the FLSA.  See 820 ILCS 105/4a(2)(E) (the IMWL's overtime-pay requirements do not apply to administrative employees who are exempt under the FLSA); 820 ILCS 115/3 (requiring employers to pay agreed-upon wages within certain time periods); (Second Am. Compl. ¶¶ 21-27 (alleging that the defendants did not pay the plaintiffs FLSA-mandated overtime pay within the time periods that the IWPCA prescribes).)

and back-end applications. (Id.) AT&T employs information-technology ("IT") professionals to troubleshoot "outages" — a general term describing any problem with an application's performance. (Id. at ¶ 6.) The company maintains an electronic alert system that detects outages as they arise and automatically notifies relevant AT&T personnel. (Id. at ¶ 8; Pls.' L.R. 56.1 Stmt. of Facts ("Pls.' Stmt.") ¶¶ 33, 52.) Once detected, AT&T's IT professionals convene an "outage call" — a teleconference (often in conjunction with an electronic chat-room session) during which the IT professionals attempt to identify and correct the problem. (Def.'s Stmt. ¶¶ 9-10; see also id. at ¶ 6 (IT professionals are "generally assigned to 'teams,' which are responsible for maintaining specific applications.").) Outage calls vary in length — from a few minutes to several hours — and they are often loud and complex. (Id. at ¶ 10.)

## II. The PDM's Role on Outage Calls

In 2006, AT&T's Architecture and Common Services Integration Availability Management Team ("ACSI Team") created the PDM position to assist with urgent ("Priority 1" or "P1") outage calls involving middleware applications. (Id. at ¶ 12; see also id. at ¶ 7 ("AT&T designates the most impactful and urgent of functionality losses as 'Priority 1,' or 'P1,' outages.").) The PDM job description states as follows:

> Become part of an elite group of individuals whose primary focus is to improve Availability and MTTR ["mean

- 4 -

time to restoral"] for Middleware Services and its client
applications. More specifically, as part of the
Middleware Support and Testing – Application Response
Team your responsibilities will include managing the
Problem Determination process. This will require
enhancement of the problem determination methodology and
process for Middleware products and environments. This
methodology and process will be used as part of the
overall effort to ensure that Middleware services and
environments have high availability and to ensure that
when there are outages, recovery is swift and complete.
As part of the role, the manager will be required to
participate in: Priority 1 outage calls, Progressive
Service Assurance Process (PSAP) meetings and be an
integral part of the Middleware Root Cause Analysis Team
(RCAT). This is a high visibility position that regularly
reports to upper management and will be required to
participate in an on-call rotation.

(Id. at ¶ 13; see also id. at ¶ 20.)   The parties have not

indicated whether AT&T requires applicants to have any particular

educational background.[3]   AT&T pays PDMs a salary — the plaintiffs

received between $80,000 and $119,000 per year — and categorizes

the position as exempt from the FLSA's overtime requirements.  (Id.

at ¶¶ 25-26.)

    If the IT professionals responding to the problem determine

that it qualifies as a "P1" outage, they contact a PDM to join the

outage call.  (Pls.' Stmt. ¶¶ 10, 53-54.)  The PDMs perform

essentially two functions on the call: (1) they document what the

IT professionals are doing to resolve the problem in order to

---

[3]/  Talley has an associate's degree in computer science from Oakland
Community College.  (See Pls.' Stmt. (Talley) ¶ 1.)  Levell has an associate's
degree in electronics.  (See Pls.' Stmt. (Levell) ¶ 1.)  The parties have not
cited Rogers's and DalCerro's educational backgrounds.

notify AT&T's management; and (2) they "facilitate" the outage call.

## A.    Outage-Call Documentation

During an outage call, PDMs ask the IT professionals to describe the problem and the steps they are taking to resolve it. (See Pls.' Stmt. ¶ 17 ("Plaintiffs would have to find out from a Technical Support Team what the team was learning from the logs so they could report that information."); Pls.' Stmt. (Rogers) ¶¶ 6, 21 (Rogers relied on the IT professionals because he did not have access to the computer logs); id. at ¶ 39 (During outages, "the PDMs did not possess any ability to log on to a server, nor any ability to look into log files.").)[4]    They then enter that information into AT&T's electronic Support Tracking Tool ("STT"), from which they send notifications to AT&T management.  (Pls.' Stmt. ¶ 10; Pls.' Stmt. (Rogers) ¶ 3.)    The PDM completes some of the fields on the electronic STT form by selecting options from drop-down menus.  (Pls.' Stmt. ¶ 12; see also ACSI STT User Documentation, attached as Ex. 2 to Bozada Dep., at 7-10.)    The form also includes fields in which the PDM must describe the outage in laymen's terms.  (See Defs.' Stmt. ¶ 18; Pls.' Stmt. of Add'l Facts No. 12; see also ACSI STT User Documentation at 7-11.) Rogers testified that he would "frequently" copy-and-paste information about the outage into the STT form from messages the IT professionals had posted on an electronic message board before he

_____

[4]    The plaintiffs have filed statements of fact relevant to all the plaintiffs, and separately enumerated statements with respect to each plaintiff.

- 6 -

had joined the call. (Pls.' Stmt. (Rogers) ¶ 24.) Bozada required the PDMs that she supervised to send an initial notification to AT&T's management within 10 minutes after receiving an outage notification. (Pls.' Stmt. ¶ 10.) After the initial notification, the PDM sends notifications to AT&T management at intervals set forth in company guidelines. (See Pls.' Stmt. ¶ 9; see also ASCI Availability Mgmt. - PDM, Roles & Responsibilities ("PDM Roles & Responsibilities"), attached as Ex. H to Defs.' Stmt., at Bates Nos. 00000034-35 (notification guidelines).)

**B.    Outage-Call "Facilitation"**

The parties agree that the following testimony accurately describes the PDM's participation on outage calls:

> Q.    And what do you take it to mean when you have heard that a PDM facilitates an outage call.
>
> A.    To me that means that they run the call; that they keep it going kind of and make sure all the questions that are asked are answered from whoever needs to answer them.  If one of the technical people said that they needed the DBA group on the call, the PDM would say, you know, I heard so and so say we needed DBA group.  We need to get them on here.  So kind of, you know, connecting any loose ends and keeping the call going, that's my definition of facilitate the call.

(Belloumini Dep., attached as Ex. B to Pls.' Stmt., at 30; see also id. at 46; Talley Dep. at 43-45; Bozada Decl., attached as Ex. F to Defs.' Stmt., ¶ 16; PDM Roles & Responsibilities at Bates No. 00000032 ("Ensure back-up support is brought to call if those working the problem seem to be struggling.").)  PDMs also "record"

"action items" that someone on the call must investigate at a later time. (Pls.' Stmt. ¶ 6.) The technical experts on the call may suggest action items for the PDM to record. (See id.; see also Pls.' Stmt. (Dal Cerro) ¶ 7.) Or else, the PDM may suggest an action item on his or her own initiative. (See Defs.' Stmt. of Add'l Facts No. 9 ("PDMs were also responsible for keeping a call moving forward by suggesting additional participants for the call, and suggesting action items based on information they received from technical experts.").)

AT&T provides written guidance regarding the PDM's role on outage calls. A "Call Checklist" describes information that the PDM must obtain "[d]uring [r]esolution." (See PDM Roles & Responsibilities at Bates Nos. 00000032-33.) AT&T has also established outage-resolution benchmarks in the form of a flow chart — the "ACSI P1 Problem Management Methodology Process" — that it requires ACSI Team members (including PDMs) to follow. (See Pls.' Stmt. ¶ 13; ACSI P1 Problem Management Methodology Process, attached as Ex. 9 to Bozada Dep.) This document requires the ACSI Team to engage more sophisticated "tiers" of technical support after certain intervals if the team has not yet resolved the outage. (See ACSI P1 Problem Management Methodology Process ("Time Elapsed is 30 mins since problem occurred" — "Can source of problem be identified" — "NO" — "Tier I support and/or MAPS engages next level of support (Tier II)" — "Time elapsed is 60 min[s] since

problem occurred — "Is outage resolved . . . ."); <u>see also</u> Pls.'
Stmt. ¶¶ 34-36, 45-50.).)  In 2010, Bozada encouraged PDMs to
"focus more closely" on the "Methodology" as a way to reduce
overall outage time.  (<u>See</u> Pls.' Stmt. ¶¶ 29-30.)

Bozada joined a substantial percentage of the outage calls
that the plaintiffs attended — the plaintiffs' estimates range from
80% to 98% of all such calls.  (<u>See</u> Pls.' Stmt. ¶ 8 (Rogers: 80%-
90%; Talley: 98%; Dal Cerro: 95%; Levell: 80%.).)  Rogers, Talley,
and Levell testified that Bozada used AT&T's electronic messaging
system to send them questions to ask on the call.  (<u>See</u> Pls.' Stmt.
(Rogers) ¶ 25 ("Bozada would specify questions she wanted Rogers to
ask, action items that she wanted Rogers to address and how she
wanted Rogers' verbiage to appear in the notifications; and would
ask Rogers to correct certain verbiage."); Pls.' Stmt. (Talley) ¶
24 (similar); Pls.' Stmt. (Levell) ¶ 21 (similar).)  At other
times, she would participate on the calls directly.  (Pls.' Stmt.
¶ 64; Pls.' Stmt. (Rogers) ¶ 25.)  Amy Belluomini, an AT&T IT
professional who participated on outage calls with the plaintiffs
and Bozada, testified that Bozada would "dominate what the PDM was
supposed to be doing . . . almost on every occasion that she came
with the call."  (Belluomini Dep. at 57; <u>see also</u> Pls.' Stmt. ¶ 64;
Defs.' Stmt. of Add'l Facts No. 11 (Bozada "took over" outage calls
when she believed that the PDM was not being assertive enough).)
Belluomini estimates that between 2006 and 2009 — her tenure as the
"team lead" for "Enterprise Websphere Support" — she participated

on over 100 outage calls with the plaintiffs. (<u>See</u> Pls.' Stmt. ¶ 31; <u>see also</u> Defs.' Stmt. of Add'l Fact No. 6.)

**III. The PDM's Role on Post-Outage Calls**

PDMs convene "Root Cause Analysis Team" ("RCAT") calls after the company's IT professionals have resolved the outage. (Defs.' Stmt. ¶ 19.) During RCAT calls, the PDMs and the IT professionals discuss the outage and consider ways to prevent similar outages from occurring in the future. (<u>Id.</u>) The parties dispute the extent to which PDMs actively participate on these "post-mortem" calls. The defendants contend that PDMs are responsible for: (1) "reviewing the details of an outage and formulating questions and comments that might help the more technically versed experts on the call determine the underlying cause of the outage;" and (2) assigning "action items" to appropriate IT professionals. (<u>Id.</u>) According to Bozada, "PDMs could and did determine root causes" — i.e., the cause of the outage — "on their own." (Defs.' Stmt. of Add'l Fact No. 5.) The plaintiffs contend that they had little input during the calls themselves, and instead simply recorded what the technical experts told them. (<u>See</u> Pls.' Stmt. of Add'l Fact Nos. 13, 16-17; Pls.' Stmt. ¶ 27.) And Rogers testified that it "wasn't unusual" for Bozada to join RCAT calls. (<u>See</u> Pls.' Stmt. (Rogers) ¶ 17.)

After the RCAT call, PDMs use the STT program to prepare a Problem Analysis Report ("PAR") summarizing the call. (Pls.' Stmt. of Add'l Facts No. 13.) They complete certain fields in the

electronic PAR form by selecting options from drop-down menus.
(Id.) Rogers and Talley testified that Bozada substantially edited
their PARs, which often went through "numerous" drafts. (Pls.'
Stmt. (Rogers) ¶ 18; Pls.' Stmt. (Talley) ¶¶ 27-28.) Rogers,
Talley, and DalCerro testified that Bozada did not authorize them
to send PARs to management without her prior approval. (See Pls.'
Stmt. ¶¶ 7, 15; Pls.' Stmt. (Rogers) ¶ 17; Pls.' Stmt. (Talley) ¶
27; Pls.' Stmt. (Dal Cerro) ¶¶ 14, 17.).)

## DISCUSSION

The parties have filed cross-motions for summary judgment with
respect to whether the PDM position falls within the FLSA's
administrative exemption. The defendants also contend that the
plaintiffs have not come forward with evidence supporting their
allegation that the defendants "willfully" violated the FLSA.
Bozada has moved for summary judgment on the separate ground that
she was not the plaintiffs' "employer" under the FLSA, and has also
moved to sanction the plaintiffs for pursuing their claims against
her.

## I.  Legal Standard

"The court shall grant summary judgment if the movant shows
that there is no genuine dispute as to any material fact and the
movant is entitled to judgment as a matter of law." Fed. R. Civ.
P. 56(a). The court must construe "all facts and reasonable
inferences in the light most favorable to the nonmoving party."

See Empress Casino Joliet Corp. v. Johnston, — F.3d —, 2014 WL 3973723, *4 (7th Cir. Aug. 15, 2014) (slip op.). "A factual dispute is 'genuine' only if a reasonable jury could find for either party." Nichols v. Michigan City Plant Planning Dept., 755 F.3d 594, 599 (7th Cir. 2014) (citation and internal quotation marks omitted). When the non-movant has the burden of proof, the moving party can satisfy its burden on summary judgment by "pointing out to the district court" that there is no evidence supporting the nonmovant's claim or defense. Celotex Corp. v. Catrett, 477 U.S. 317, 325 (1986); see also Modrowski v. Pigatto, 712 F.3d 1166, 1167 (7th Cir. 2013). "Upon such a showing, the nonmovant must then 'make a showing sufficient to establish the existence of an element essential to that party's case.'" Modrowski, 712 F.3d at 1168 (quoting Celotex, 477 U.S. at 322).

## II.  The Administrative Exemption

The FLSA exempts from overtime-pay coverage individuals employed in a bona fide administrative capacity. 29 U.S.C. § 213(a)(1). The Secretary of Labor has established a three-part test to determine whether the administrative exemption applies:

> (a) The term "employee employed in a bona fide administrative capacity" in section 13(a)(1) of the Act shall mean any employee:

> (1) Compensated on a salary or fee basis at a rate of not less than $455 per week (or $380 per week, if employed in American Samoa by employers other than the Federal Government), exclusive of board, lodging or other facilities;

(2) Whose primary duty is the performance of office or non-manual work directly related to the management or general business operations of the employer or the employer's customers; and

(3) Whose primary duty includes the exercise of discretion and independent judgment with respect to matters of significance.

29 CFR § 541.200(a). It is the defendants' burden to prove by a preponderance of the evidence that the plaintiffs are exempt. See Corning Glass Works v. Brennan, 417 U.S. 188, 196-97 (1974); Blanchar v. Standard Ins. Co., 736 F.3d 753, 756 (7th Cir. 2013). When evaluating a claimed exemption, the court must conduct "a thorough, fact-intensive analysis of the employee's employment duties and responsibilities." Schaefer-LaRose v. Eli Lilly & Co., 679 F.3d 560, 576-77 (7th Cir. 2012). "As a remedial statute, the exemptions are narrowly drawn against the employers." Johnson v. Hix Wrecker Serv., Inc., 651 F.3d 658, 660 (7th Cir. 2011); see also Schaefer-LaRose, 679 F.3d at 570; but see Yi v. Sterling Collision Centers, Inc., 480 F.3d 505, 508 (7th Cir. 2007) (the principle of narrow interpretation does not raise the defendant's burden of proof beyond a preponderance of the evidence; it merely serves as "a tie breaker."). "Determining the duties encompassed by an employee's position is a question of fact; determining the appropriate FLSA classification is a question of law." Roe-Midgett v. CC Services, Inc., 512 F.3d 865, 869 (7th Cir. 2008).

- 13 -

## A. Whether the Plaintiffs Satisfy § 541.200(a)'s Minimum Salary Requirements.

The plaintiffs concede that AT&T paid them more than $455 per week during the relevant time period. (See Defs.' Stmt. ¶ 26; Pls.' Mem. at 17.) The plaintiffs also admit that Levell's salary exceeded $100,000, (see Defs.' Stmt. ¶ 26), making him a "[h]ighly compensated employee" under FLSA regulations. See 29 C.F.R. § 541.601(a). Highly compensated employees are exempt if they "customarily and regularly" perform one or more exempt duties of an administrative employee. Id.

## B. Whether the Plaintiffs' Duties Were "Directly Related" to AT&T's "General Business Operations."

The plaintiffs argue that their job duties as PDMs did not "directly relate" to AT&T's "general business operations." (See Pls.' Mem. at 17–18, 23.) The Department of Labor's regulations provide guidance regarding this requirement:

> To qualify for the administrative exemption, an employee's primary duty must be the performance of work directly related to the management or general business operations of the employer or the employer's customers. The phrase "directly related to the management or general business operations" refers to the type of work performed by the employee. To meet this requirement, an employee must perform work directly related to assisting with the running or servicing of the business, as distinguished, for example, from working on a manufacturing production line or selling a product in a retail or service establishment.

29 C.F.R. § 541.201(a). The work that the plaintiffs performed as PDMs was ancillary to, and distinct from, AT&T's core business. See Schaefer-LaRose, 679 F.3d at 576–77 (holding that the duties of

- 14 -

pharmaceutical sales representatives are "directly related" to their employer's "general business" because their work supports the company's core business, but is "distinct from it"). As PDMs, the plaintiffs did not sell phones or install network services. They supported that business by "facilitating" outage calls and summarizing information about the outage for AT&T's management. See 29 C.F.R. § 541.201 (a) (Exempt employees "must perform work directly related to assisting with the running or servicing of the business, as distinguished, for example, from working on a manufacturing production line or selling a product in a retail or service establishment."). The plaintiffs do not address Shaefer-LaRose, which is controlling authority regarding the type of duties that satisfy 29 C.F.R. § 541.200(2).[5] The undisputed facts establish that the plaintiffs' duties were directly related to AT&T's general business.

**C. Whether the Plaintiffs Exercised Discretion and Independent Judgment with Respect to Matters of Significance.**

An employee exercises discretion and independent judgment when the employee compares and evaluates possible courses of conduct, and acts after considering the alternatives. See 29 C.F.R. §

---

[5] Instead, the plaintiffs rely on non-controlling authority from other jurisdictions interpreting regulations that the Secretary of Labor has since revised. See Martin v. Indiana Power Co., 381 F.3d 574, 582-83 (6th Cir. 2004); Jackson v. McKesson Health Solutions, LLC, 2004 WL 2453000, *5 (D. Mass. Oct. 29, 2004).

541.202(a). The Department of Labor has provided a non-exclusive

list of relevant factors:

> [W]hether the employee has authority to formulate, affect, interpret, or implement management policies or operating practices; whether the employee carries out major assignments in conducting the operations of the business; whether the employee performs work that affects business operations to a substantial degree, even if the employee's assignments are related to operation of a particular segment of the business; whether the employee has authority to commit the employer in matters that have significant financial impact; whether the employee has authority to waive or deviate from established policies and procedures without prior approval; whether the employee has authority to negotiate and bind the company on significant matters; whether the employee provides consultation or expert advice to management; whether the employee is involved in planning long- or short-term business objectives; whether the employee investigates and resolves matters of significance on behalf of management; and whether the employee represents the company in handling complaints, arbitrating disputes or resolving grievances.

Id. at § 541.202(b); see also Schaefer-LaRose, 679 F.3d at 582

("The ultimate question is not whether the plaintiff did all, or

any, of the specific tasks listed in § 541.202(b); the list

identifies itself as exemplary and non-exhaustive."). The

exemption does not apply to "clerical or secretarial work,

recording or tabulating data, or performing other mechanical,

repetitive, recurrent or routine work." Id. at § 541.202(e). "The

exercise of discretion and independent judgment implies that the

employee has authority to make an independent choice, free from

immediate direction or supervision." See id. at § 541.202(c). But

an employee may still be exempt even if more senior employees

- 16 -

review his or her decisions.  <u>See</u> <u>id.</u>  The "'significance' of the work refers to the "importance or consequence of the work performed."  <u>Id.</u> at §541.202(a).  "An employee does not exercise discretion and independent judgment with respect to matters of significance merely because the employer will experience financial losses if the employee fails to perform the job properly."  <u>Id.</u> at § 541.202(f).

**1.  The Defendants' Motion for Summary Judgment**

(a) <u>Plaintiffs Rogers, Talley, and DalCerro</u>

The court concludes that there is a genuine dispute of fact regarding whether the plaintiffs' primary duty was to "run" outage and RCAT calls or, instead, to generate status reports for management.  "The term 'primary duty' means the principal, main, major or most important duty that the employee performs."  29 CFR § 541.700(a). Relevant factors include:

> [T]he relative importance of the exempt duties as compared with other types of duties; the amount of time spent performing exempt work; the employee's relative freedom from direct supervision; and the relationship between the employee's salary and the wages paid to other employees for the kind of nonexempt work performed by the employee.

<u>Id.</u>  The amount of time the employee spends performing exempt duties is also relevant:  "employees who spend more than 50 percent of their time performing exempt work will generally satisfy the primary duty requirement."  <u>Id.</u> at § 541.700(b).  Viewing the evidence in the light most favorable to the plaintiffs, a

- 17 -

reasonable jury could conclude that the PDM's reporting function on outage and RCAT calls is "clerical." See id. at § 541.202(e) (the exemption does not encompass clerical work). PDMs ask questions during outage and RCAT calls in order to complete designated fields in the STT program. They then record the technical experts' responses, sometimes verbatim. (See Pls.' Stmt. ¶¶ 56, 62; Pls.' Stmt. (Talley) ¶ 4; Pls.' Stmt. (Levell) ¶¶ 19-20; Pls.' Stmt. (Rogers) ¶¶ 4, 16, 19; Pls.' Stmt. (DalCerro) ¶¶ 14-15.) Collecting facts sometimes involves discretion — as when an employee investigates a crime and independently decides whether to pursue certain leads. See, e.g., Mullins v. Target Corp., No. 09 C 7573, 2011 WL 1399262, *6-7 (N.D. Ill. Apr. 13, 2011) (the plaintiff exercised discretion when investigating fraud and theft at his employer's stores). And generally speaking, troubleshooting entails discretion. See Demos v. City of Indianapolis, 302 F.3d 698, 705 (7th Cir. 2002) ("At a minimum, 'putting out fires' for his supervisor meets the discretionary component of § 541.214(a) . . . ."). PDMs, by contrast, summarize another party's investigation/troubleshooting and often do not understand what they are summarizing. (See, e.g., Pls.' Stmt. ¶¶ 72, 74; Pls.' Stmt. (Talley) ¶ 19; Pls.' Stmt. (DalCerro) ¶ 2.)

The record contains some evidence that PDMs do exercise some discretion, but the parties dispute the extent of their authority. Bozada praised the plaintiffs for being "assertive" and "vocal,"

- 18 -

and criticized them when they were not. She encouraged the plaintiffs to develop their technical knowledge in order to manage outage calls more effectively. See Schaefer-LaRose, 679 F.3d at 581 ("The level of attention given to substantive education demonstrates that the company viewed these individuals as employees needing a solid understanding of the message that they were delivering if they were to fulfill their roles as the company's representative to the community of practicing physicians."). Levell testified that he made "judgment call[s]" based upon his "experience" when determining whether "the support teams seem like they have a handle" on the problem. (Levell Dep., attached as Ex. B to Defs.' Stmt., at 48.) So, contrary to the plaintiffs' argument, they were more than just "scriveners." On the other hand, there is evidence that the plaintiffs' role on outage calls was limited. The technical experts responding to the outage determine whether it qualifies as a "P1" outage. They then contact a PDM, who joins the call already in progress. Rogers testified that the appropriate application team would already be on the call when he joined it. (See Pls.' Stmt. (Rogers) ¶ 5.) The application team often takes the initiative to obtain additional support when they determine it is necessary. (See Talley Dep. at 42-44 (testifying that the technical experts determined who should be brought onto the call as additional support).) PDMs can respond to basic cues that an outage call may have stalled — e.g., someone

is non-responsive or appears to be "struggling" — and then suggest that other personnel join the call. Belluomini's testimony, however, undercuts the defendants' argument that this was their primary duty:

> Although the Plaintiffs in the Rogers litigation as PDMs participating on the call could, theoretically sense the technical expert struggling or reaching the limit of his or her knowledge, in my experience I have never witnessed one of these Plaintiffs, or any other PDM, decide on their own that the currently engaged technical expert needed to be replaced with a different or supplemental tier of support.

(Belluomini Decl., attached as Ex. C to Pls.' Stmt., ¶ 5.) She further testified that only the technical experts would know who to engage next because only they have access to the data about the affected applications and the nature of the error. (Id. at ¶ 6; see also Pls.' Stmt. (Talley) ¶ 12; Pls.' Stmt. (Levell) ¶ 12.) Also, AT&T requires everyone on the outage call to follow the "Problem Management Methodology," which dictates when the participants must "escalate" problems to different, more sophisticated support teams. (See ACSI P1 Problem Management Methodology Process ("Time Elapsed is 30 mins since problem occurred" — "Can source of problem be identified" — "NO" — "Tier I support and/or MAPS engages next level of support (Tier II) — "Time elapsed is 60 min[s] since problem occurred — "Is outage resolved . . . .").) Evidence in the record suggests that the "Problem Management Methodology" functioned as a kind of call script. (See Pls.' Stmt. (Rogers) ¶ 14 ("As a PDM, Rogers' responsibility was to

- 20 -

follow the Problem Management Methodology Document mandates and to ask the questions when the document required the questions to be asked.").)  With respect to the RCAT calls, the defendants have not cited any particular instance in which a PDM determined an outage's "root cause."  In the abstract, assigning "action items" — on RCAT and outage calls — appears to involve discretion.  (See Defs.' Stmt. ¶ 37 (citing Levell's testimony that he would "hound" RCAT Team members to identify the "root cause" of an outage); id. at ¶ 38 (citing Rogers's testimony that, after consulting with the relevant expert, he would assign due dates for action items and extend those dates if the expert asked for more time).)  But the voluminous summary-judgment record is short on particulars.  The defendants have not cited any outage notifications or PAR reports.  Without knowing the PDMs' options, it is difficult to assess whether, or to what extent, they make independent, discretionary decisions about "significant" matters.

Finally, none of the cases upon which the defendants rely involves oversight comparable to the degree of supervision that Bozada exercised over the plaintiffs' work.  Cf. Blanchar, 736 F.3d at 758 (noting that the plaintiff "worked largely alone and met with his supervisor only once a year"); Schaefer-LaRose 679 F.3d at 581 ("Representatives also spend the vast majority of their time entirely unsupervised."); Roe-Midgett, 512 F.3d at 567 (noting that the claims-adjuster plaintiffs "spend much of their time in the

field without direct supervision"); Rock v. Ray Anthony Intern., LLC, 380 Fed.Appx. 875, 880 (11th Cir. 2010) ("Rock, in the district court's view, required neither input nor approval when making these decisions."). The defendants argue that Bozada monitored the plaintiffs because they lacked initiative: she would have been less involved if the plaintiffs had been more assertive. (See Defs.' Stmt. of Add'l Facts Nos. 9, 11; Defs.' Reply at 8, 11-12.) First, as the moving party, the defendants are not entitled to that inference. Second, they have failed to cite any evidence suggesting that the plaintiffs were less assertive than other PDMs. Bozada praised Rogers for being "vocal" on outage calls, but she still attended approximately 80% of the outage calls in which he participated. (See, e.g., AT&T Achievement and Development (2009), attached as part of Group Ex. 3(a) to Bozada Decl., at Bates No. ATT000133 ("Paul has increased his verbal presence on outage calls and become more of a leader on ACSI P1 calls to drive the calls through resolution.").) The defendants also argue that Bozada did not *prevent* the plaintiffs from exercising independent judgment. (See Defs.' Reply at 8.) But that does not make her oversight any less pervasive.

In sum, genuine disputes of fact exist about whether Rogers, Talley, and DalCerro qualify for the FLSA's administrative exemption.

- 22 -

(b) <u>Plaintiff Levell</u>

The defendants' motion is a closer call as it applies to Levell. Because Levell is a "highly compensated employee," the defendants only need to prove that he "customarily and regularly" performed exempt work. <u>See</u> 29 C.F.R. § 541.601(a). "The phrase 'customarily and regularly' means a frequency that must be greater than occasional but which, of course, may be less than constant. Tasks or work performed 'customarily and regularly' includes work normally and recurrently performed every workweek; it does not include isolated or one-time tasks." <u>Id.</u> at § 541.701. As the court discussed in connection with the other plaintiffs, there is undisputed evidence that PDMs exercise *some* discretion. Moreover, Levell's own resume tends to support the defendants' argument that PDMs exercise discretion and independent judgment:

> The main function of the ACSI PDM Team is to join Severity 1 outage calls in a 7x24x365 environment that affect the ACSI organization and the clients of ACSI and <u>to manage the outage call to resolve the trouble as quickly as possible</u>. Provide timely outage information to the Leadership Team of ACSI. The ACSI Root Cause Analysis Team's main function is to <u>evaluate information</u> from Severity 1 outage calls including log files, alerts, timelines and other available data to determine the root cause of the outage. After the root cause is identified, <u>pursue completion of Action Items</u> and Proactive steps to prevent the error condition from causing future outages to AT&T.

(<u>See</u> Levell Resume, attached as Ex. K to Defs.' Stmt., at 3 (emphasis added).) On the other hand, as the court just discussed, there is evidence that PDMs actually do relatively little

- 23 -

"managing" and "evaluating." (See supra pp. 16-21.) Also, Bozada directly supervised Levell on 80% of his outage calls, and reviewed and approved all of his PARs. Viewing the evidence in the light most favorable to Levell, the defendants are not entitled to judgment as a matter of law that he exercised discretion and independent judgment on significant matters more than "occasionally."

## 2. The Plaintiffs' Motion for Summary Judgment

As the court previously suggested, a reasonable jury could conclude that PDMs exercise discretion when deciding whether the "appropriate" personnel are on an outage call. (See Levell Dep. at 48 (Levell made "judgment call[s]" based upon his "experience" when determining whether "the support teams seem like they have a handle" on the problem.).) Their discretion and independence were limited. (See supra.) The fact that some PDMs are more assertive than others, however, suggests that they have leeway to decide the best way to obtain information on outage calls. The PDM job description, the "PDM Roles & Responsibilities," and the plaintiffs' performance reviews support the conclusion that AT&T expected PDMs to help streamline outage resolution. (See Defs.' Stmt. ¶ 13 (the PDM job description states that "managing" the problem-determination process "will require enhancement of the problem determination methodology and process for Middleware products and environments"); PDM Roles & Responsibilities at Bates

No. 00000033 (the PDM should "observe" RCAT calls and "make recommendations on ways to improve MTTR [mean time to restoral]"); AT&T Achievement and Development (2009) (Rogers), attached as part of Group Ex. 3 to Bozada Decl., at 7 (encouraging Rogers to "develop methods that will allow him to review incidents and formulate questions that look at not only the current incident he is working but what actions can teams take to prevent similar incidents from recurring (the bigger picture).").) PDMs undergo several weeks of training before attending outage calls, (see Defs.'s Stmt. ¶ 14), and Bozada encouraged the plaintiffs to learn more about AT&T's computer applications. (See id. at ¶ 29; see also AT&T Achievement and Development (2009) (Levell), attached as Ex. 3b to Defs.' Stmt., at Bates No. ATT000352 ("Mark has a strong understanding of the applications and IT networks which aids in assessing issues during outage calls — Mark should feel confident in sharing that knowledge to help teams mitigate issues quickly.").) The defendants contend that PDMs sometimes determine an outage's "root cause" on RCAT calls. (See Defs.' Stmt. of Add'l Fact No. 5; Green Dep. at 54; see also "AT&T pre-Performance Improvement Plan," attached as Ex. J to Defs.' Stmt., at 2 ("Colleen does not follow the documented process and procedures for RCAT in performing an independent review of the incidents but works directly with the application owner to document their words for root cause and implementation of action items.").) Or else steer

the discussion in ways that make the calls more efficient. (<u>See</u> Bozada Decl. ¶ 18 ("As a PDM, I was responsible for reviewing the details of an outage before the RCAT call and formulating questions and comments that might help the technical experts on the call determine the underlying cause of the outage under discussion.").)

The strongest evidence supporting the plaintiffs' motion is Bozada's direct supervision. This evidence, however, does not entitle the plaintiffs to judgment as a matter of law. First, the Department of Labor's regulations do not elevate one factor above others in determining the exempt status of a particular employee. The fact that Bozada supervised most of the calls that the plaintiffs attended does not necessarily override evidence that they exercised discretion and independent judgment. Second, there is evidence that Bozada was more active on some calls than others. (<u>See</u> Defs.' Stmt. of Add'l Facts No. 11.) Bozada criticized Talley for not being assertive on outage and RCAT calls. (<u>See</u> "AT&T pre-Performance Improvement Plan" at 2 (criticizing Talley for relying on other Acsi Team members to take the initiative on outage and RCAT calls).) She also praised other plaintiffs for being "vocal," developing relationships with the application teams, and applying their limited technical knowledge — not to resolve outages, but to *manage* the outage calls. (<u>See, e.g.</u>, AT&T Achievement and Development (2009) (Rogers), attached as part of Group Ex. 3(a) to Bozada Decl., at Bates No. ATT000133 ("Paul has increased his

verbal presence on outage calls and become more of a leader on ACSI P1 calls to drive the calls through resolution."); "My Performance Plan (2011)" (DalCerro), attached as Ex. 3(d) to Defs.' Stmt., at ATT052620 ("Corey has a great amount of technical knowledge that allows [him] to lead incident calls, he should use this same knowledge when assessing issues during post mortem call reviews."); "My Performance Plan (2011) (Levell), attached as part of Group Ex. 3(b) to Defs.' Stmt., at Bates No. ATT000352 ("Mark has built up relationships both within ACSI and within the RPM, IM and AOM teams in his role and he is looked at frequently as a SME on the availability items for ACSI. This has helped ensuring our availability metrics are accurate and tickets documented completely.").) A reasonable jury could conclude from this evidence that the plaintiffs exercised independent judgment despite Bozada's supervision. The court thus denies the plaintiffs' motion for summary judgment.

## III. Willfulness

The defendants have also moved for summary judgment on the plaintiffs' claim that they willfully violated the FLSA. (See Second Am. Compl., Count II, ¶¶ 14-16.) The FLSA's default statute of limitations is two years. See 29 U.S.C. § 255(a). If the plaintiffs prove a willful violation, then the FLSA extends the statute of limitations to three years. See id.; Bankston v. State of Ill., 60 F.3d 1249, 1253 (7th Cir. 1995) (It is the plaintiffs'

burden to prove that the defendants willfully violated the statute.). Willfulness is a question of fact, see Pignataro v. Port Authority of New York and New Jersey, 593 F.3d 265, 273 (3d Cir. 2010), but the court may decide the issue as a matter of law if the plaintiff does not produce evidence that would enable a reasonable jury to find in his or her favor. See Howard v. City of Springfield, Illinois, 274 F.3d 1141, 1144 (7th Cir. 2001) (The plaintiffs "failed to submit any evidence that the violation was willful in this case, and therefore the court properly held that the two-year period applied."); Caraballo v. City of Chicago, 969 F.Supp.2d 1008, 1025 (N.D. Ill. 2013) (granting the defendant's motion for summary judgment where the plaintiff "failed to submit any competent evidence" that the defendant had willfully violated the FLSA). The parties dispute whether willfulness is an appropriate matter for summary judgment at this stage of the case given the court's order bifurcating liability and "damages computation" for purposes of summary judgment. (See Minute Entry, dated Aug. 27, 2013, Dkt. 76; see also Pls.' Mem. at 1, n.1; Defs.' Reply at 15-16.) It is difficult to see how plaintiffs' counsel could have construed the court's order to exclude "willfulness" from the current briefing. A finding that the defendants willfully violated the statute establishes their *liability* for three years of unpaid overtime; the actual *amount* owed during that time is a "computational" issue. The court's order bifurcated liability and

damages only for purposes of summary judgment. Discovery is closed, and any evidence establishing the defendants' willful conduct was available to the plaintiffs when they filed their response to the defendants' summary-judgment motion. They have not cited any evidence in the record that would enable a reasonable jury to conclude that the defendants willfully violated the FLSA. The court grants the defendants' motion for summary judgment with respect to Count II of the plaintiffs' complaint.

## IV. The Defendants' Motion for Summary Judgment on the Plaintiffs' Claims Against Bozada and Their Motion for Sanctions

### A. Whether Bozada Was the Plaintiffs' "Employer"

The defendants have also moved for summary judgment on the plaintiffs' claims against Bozada, individually. The plaintiffs must show that she was their "employer" to recover damages from her for unpaid overtime. See 29 U.S.C. § 207(a)(1); see also id. at § 203(d) ("'Employer' includes any person acting directly or indirectly in the interest of an employer in relation to an employee . . . ."). Whether or not an individual is an "employer" under the statute turns on the "economic reality" of the parties' working relationship. Karr v. Strong Detective Agency, Inc., a Div. of Kane Services, 787 F.2d 1205, 1207 (7th Cir. 1986) (quoting Goldberg v. Whitaker House Cooperative, Inc., 366 U.S. 28, 33 (1961)) (internal quotation marks omitted). An individual may be liable as an "employer" if he or she "had supervisory authority over the complaining employee and was responsible in whole or part

for the alleged violation." <u>Riordan v. Kempiners</u>, 831 F.2d 690, 694 (7th Cir. 1987). Relevant factors include whether the defendant "(1) had the power to hire and fire the employees; (2) supervised and controlled employee work schedules or conditions of employment; (3) determined the rate and method of payment; and (4) maintained employment records." <u>Harris v. Skokie Maid and Cleaning Service</u>, No. 11 C 8688, 2013 WL 3506149, *5 (N.D. Ill. July 11, 2013).

The undisputed evidence establishes that Bozada was not the plaintiffs' "employer" under the FLSA. The plaintiffs have not presented any evidence that Bozada had any authority or influence over AT&T's FLSA obligations or its payroll. They cite evidence that Bozada "hired" DalCerro, (<u>see</u> Pls.' Stmt. (DalCerro) ¶ 1), but they have not argued that Bozada had the power to fire the plaintiffs. The plaintiffs argue that Bozada is liable because she required them to send an initial notification to AT&T management within 10 minutes after receiving an outage notification. According to the plaintiffs, this "10 minute rule" kept the plaintiffs tethered to their computers whenever they were "on call," contributing to the total number of overtime hours that they worked. (<u>See</u> Pls' Mem. at 27-29.) The FLSA does not impose a 40-hour work week. It requires employers to pay employees time-and-a-half for all hours worked over 40 hours. <u>See</u> 29 U.S.C. § 207(a)(1). AT&T did not pay the plaintiffs overtime because it

- 30 -

classified them as exempt, and it is undisputed that Bozada was not responsible for that classification. (<u>See</u> Defs.' Stmt. ¶ 24.) The cases upon which the plaintiffs rely suggest that, in cases involving clearly nonexempt employees, there will often be disputed facts about the defendant's control over the plaintiff's working conditions. <u>See</u> <u>Arteaga v. Lynch</u>, No. 10 C 1444, 2013 WL 5408580, *1 (N.D. Ill. Sept. 26, 2013); <u>Harris</u>, 2013 WL 3506149, at *1. In this case, Bozada's control over the plaintiffs' work schedules is irrelevant.

In the alternative, the plaintiffs ask the court to "expand the definition of employer to encompass such individuals as Bozada, who act alone in creating a condition of employment (an unreasonable one at that) which in turn results in scores of unpaid overtime." (Pls.' Mem. at 31-32.) The plaintiffs' proposed rule is unworkable, unfair, and unsupported by the law. AT&T gave Bozada authority to supervise a position that the company classified as exempt. It would serve no purpose to require her to exercise that authority as if the position was nonexempt or else face damages under the FLSA. Bozada is entitled to summary judgment on the plaintiffs' claims against her.

## B. The Defendants' Motion for Sanctions

The defendants have moved for sanctions against the plaintiffs for pursuing their FLSA claims against Bozada. <u>See</u> Fed. R. Civ. P. 11(b). "[A] court may impose sanctions on a party for making

arguments or filing claims that are frivolous, legally
unreasonable, without factual foundation, or asserted for an
improper purpose." <u>Fries v. Helsper</u>, 146 F.3d 452, 458 (7th Cir.
1998) (citation and internal quotation marks omitted). A claim is
"frivolous" if it is "baseless or made without a reasonable and
competent inquiry." <u>Berwick Grain Co., Inc. v. Illinois Dept. of
Agriculture</u>, 217 F.3d 502, 504 (7th Cir. 2000) (citation and
internal quotation marks omitted). The FLSA "broadly" defines the
term "employer," and there is no bright-line test to determine
whether an individual qualifies in a particular case. See <u>Karr</u>,
787 F.2d at 1207; <u>Secretary of Labor, U.S. Dept. of Labor v.
Lauritzen</u>, 835 F.2d 1529, 1534 (7th Cir. 1987). The defendants
have not cited any cases — controlling or otherwise — that hold
that control over the decision to treat employees as exempt is
necessary to establish liability. (<u>See</u> Defs.' Mem. (Sanctions) at
9-10.) The court concludes that the plaintiffs' claims against
Bozada, while meritless, are not frivolous. The defendants also
argue that the plaintiffs sued Bozada because they have a "personal
grudge against her." (Defs.' Sanctions Mem. at 2.) As evidence of
their desire for "vengeance," (<u>id.</u> at 11), the defendants cite: (1)
Levell's testimony that he did not like Bozada, (<u>see</u> Level Dep. at
83); (2) Talley's testimony that she filed this lawsuit in part
because she felt that Bozada had "bullied" her, (<u>see</u> Talley Dep.
at 115); and (3) a motion to compel that the plaintiffs filed to

obtain Bozada's own employee evaluation. (See Defs.' Sanctions Mem. at 2, n.2.) The plaintiffs' personal feelings about Bozada are largely irrelevant given the court's conclusion that their claims against her are not frivolous. The defendants argue that the plaintiffs sought Bozada's evaluation to harass her, but the court concluded otherwise when it granted the plaintiffs' motion to compel. (See Minute Entry, dated May 13, 2013, Dkt. 52.) Finally, Bozada's status as a defendant has not materially increased her participation in this case. She is a material witness. The plaintiffs would have deposed Bozada even if they had not named her as a defendant, and AT&T would have relied on her to develop and support its defense. The court denies the defendants' motion for sanctions.

## CONCLUSION

The court grants the defendants' motion for summary judgment [64] in part, and denies it in part. The court grants the motion with respect to the plaintiffs' claims against Bozada, individually, and on the plaintiffs' claim that the defendants willfully violated the FLSA. The court otherwise denies the

motion. The court denies the plaintiffs' motion for summary judgment [89]. The court denies the defendants' motion for sanctions [67]. A status hearing is set for September 18, 2014 at 8:45 a.m. in courtroom 1241.


DATE:       September 3, 2014

ENTER:      _____

            Amy St. Eve, United States District Judge